30 September 1999

NO. 5-98-0325

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

EDWARD MORRIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellant, )  St. Clair County.

)

)  No.  97-L-294

)

ARTHUR MARGULIS and MARGULIS & )

GRANT, P.C., )

)

     Defendants, )

)

and )

)

BRYAN CAVE, LLP, JOHN GOEBEL, )

DANIEL O'NEILL, J. THOMAS ARCHER, )

and ALAN J. DIXON, )  Honorable

)  John Goodwin,

     Defendants-Appellees. )  Judge, presiding.

________________________________________________________________________

JUSTICE MAAG delivered the opinion of the court:

Plaintiff Edward Morris appeals an order of the circuit court of St. Clair County granting summary judgment against him and in favor of defendants Bryan Cave, LLP (Bryan Cave), John Goebel, Daniel O'Neill, J. Thomas Archer, and Alan J. Dixon.  The individual defendants are all partners in the Bryan Cave firm.  For the reasons that follow, we reverse and remand.

This action grows out of the failure of the former Germania Bank (Germania), a St. Louis, Missouri-based savings and loan.  Various civil and criminal actions flowed from Germania's failure, including actions against some officers and directors of Germania.  The plaintiff in this action, Morris, was sued civilly and prosecuted criminally.  Morris was convicted of various criminal charges.  His conviction was affirmed on appeal.  In this action, Morris alleges an attorney-client relationship existed between himself and the defendants.  Morris claims that the defendants breached the fiduciary duties owing from them to him and that he was damaged as a result.  With this general background, we will now address the issues raised in this case.

I. Facts

A detailed description of the complex facts underlying this case is necessary to an understanding of the plaintiff's claims against Bryan Cave and its partners.  Plaintiff Edward Morris is a former officer and director of Germania Bank.  In this decision we will refer to certain persons as either an "outside" or "inside" director of Germania because that is how the parties referred to them in the trial court.  An outside director is a director who served on the board of Germania but was not a full-time employee of the bank.  An inside director was both a member of the board of directors and a full-time employee.  Morris was an inside director.

Bryan Cave is a St. Louis-based law firm.  Attorneys from Bryan Cave represented Morris personally in several matters and served as corporate counsel for Germania.  John Goebel, Daniel O'Neill, J. Thomas Archer, and Alan J. Dixon are attorneys and partners at Bryan Cave.  John Goebel was an outside director of Germania Bank and advised Germania and its officers as corporate counsel.  Bryan Cave represented John Goebel and other outside directors in the civil suits resulting from the Germania collapse.  Daniel O'Neill represented John Goebel during the criminal investigation of the Germania collapse.  Edward Morris, the plaintiff, is married to Peggy Morris, an attorney who was employed at Bryan Cave during the events at issue in this case.  

A. Bryan Cave's Acknowledged Attorney-Client Relationship With Edward Morris

Bryan Cave began representing Morris prior to Morris joining Germania.  In 1983, Kathleen Sherby, a partner at Bryan Cave, wrote a will for Morris.  The will prepared by Sherby for Edward Morris names Sherby as successor executor of his estate.  David Slavkin, a partner at Bryan Cave, represented Morris in domestic relations matters in late 1989 and early 1990.  Morris left Germania in 1988 and was then employed by Steifel Nicholas as an investment banker.  In 1990, Edward Morris left Steifel Nicholas.  E. Perry Johnson, a partner at Bryan Cave, reviewed a severance agreement for Morris related to his departure from Steifel Nicholas.  

According to Peggy Morris, she also represented her husband during the time she was an attorney employed at Bryan Cave.  In 1993, staff at Bryan Cave prepared living wills and durable powers of attorney for the parents of Edward Morris at the request of Peggy Morris.  In the early 1990s, Peggy Morris supervised a Bryan Cave legal assistant in completing paperwork for the incorporation of the Fortune Group Financial Corporation.  Edward Morris was a 50% shareholder in the corporation.  John Goebel was the billing partner involved with that incorporation, according to Peggy Morris.  In his deposition, Goebel testified that he was aware that Bryan Cave had an attorney-client relationship with Morris through the representation of Edward Morris by Peggy Morris, David Slavkin, E. Perry Johnson, and Kathleen Sherby.  Peggy Morris further contends that Edward Morris frequently discussed a variety of legal matters with her and that she advised him as attorney.

B. The Disputed Attorney-Client Relationship

Morris became president and CEO of Germania in February 1986 and chairman in June 1986.  While Edward Morris was employed at Germania, problems developed in the bank's loan portfolio, which led to the seizure of Germania by the Office of Thrift Supervision.  Germania's seizure was followed by the filing of civil suits and criminal charges against various officers and directors of Germania.  Morris and Goebel, along with other Germania directors, were sued civilly.  Morris was indicted on federal mail and wire fraud charges on November 19, 1992.  Goebel was notified by the United States Attorney's office that he was a "subject" of the criminal investigation.  

The crux of the criminal charges is set out in 
United States v. Morris
, 80 F.3d 1151 (7th Cir. 1996).  We will first briefly describe the facts related to the charges.  After the deregulation of the savings and loan industry in the early 1980s, Germania expanded its loan portfolio to include larger multifamily residential and commercial loans, in addition to the residential real estate loans it had previously made.  In September 1987, an in-depth quarterly analysis (the September Analysis) of the bank's loan portfolio recommended that Germania approve an additional $9.3 million in loan loss reserves.  The executive committee, including Edward Morris, did not approve additional loan loss reserves.  They authorized only those reserves necessary to cover identified losses in the portfolio.  Germania then proceeded to embark on a $10 million offering of subordinated capitol notes ("Schnotes"), using an offering circular describing the current loan loss reserves as "adequate."  The failure to disclose the September Analysis in the offering circular led to the conviction of Morris for mail and wire fraud. 

The facts concerning how and why Germania decided not to approve additional loan loss reserves or report the contents of the September Analysis are in controversy.  Edward Morris contends that he discussed the September Analysis and loan loss reserves with John Goebel.  Morris states that he showed the September Analysis to Goebel and discussed loan loss reserves with him during an hour and a half meeting on September 23, 1987.  Morris further states that a few days after that meeting, he called John Goebel and asked him if the September Analysis information should be reported to shareholders.  

Goebel admits consulting with Morris on September 23, 1987.  He also admits speaking with Morris on the telephone in the days following that meeting.  Both the consultation and the telephone conversations are recorded in the Bryan Cave billing records.  He denies discussing the loan loss reserves or advising Morris not to report the September Analysis.

Approximately one year later, in late October 1988, Morris left Germania to return to work for Steifel Nicholas as an investment banker.  Morris and Goebel agree that prior to his departure they discussed Morris's reasons for leaving Germania.  Morris remained on the board of directors at Germania until June 1990.

In June 1990, the Office of Thrift Supervision seized Germania.  The Resolution Trust Corporation (RTC) became the conservator for Germania.  Shortly thereafter, a civil lawsuit (the Asbury case) was filed against the directors and Germania.  This case was later consolidated with another civil suit.  The combined suits were based on the conduct of Germania and its directors regarding "Schnotes."  The suits named Germania and its directors, including Edward Morris and John Goebel, as defendants.  

Morris asked Bryan Cave to represent him after Germania was seized.  Bryan Cave declined, citing a conflict of interest.  Bryan Cave then represented John Goebel and other directors of Germania in the Asbury case.  Morris contends that Bryan Cave delayed in informing that they would not represent him.  

The record does not show what Morris divulged to Bryan Cave when requesting representation.  Nor does the record show how many conversations occurred between Morris and Bryan Cave attorneys before Bryan Cave communicated to Morris its refusal to represent him.  Peggy Morris states that when Bryan Cave declined to represent her husband in the Asbury case, she was assured that Bryan Cave would lend friendly assistance and cooperation to Edward Morris.

Soon after the seizure of Germania and the filing of the Asbury case, Germania became the target of a Securities and Exchange Commission (S.E.C.) investigation and a criminal investigation.  Morris retained other legal counsel to represent him in these matters. He contends, however, that he continued to discuss the matter with his wife and with John Goebel.  For example, Morris states that in 1992 he discussed with John Goebel an asset freeze placed on Germania by RTC and the "general course of litigation."  Peggy Morris states that she discussed the Germania matters with her husband and with Bryan Cave attorneys on several occasions.  Peggy Morris contends that her conversations with Daniel O'Neill included discussions of loan loss reserves and whether Morris had done anything criminal.

Dan O'Neill represented John Goebel in the Asbury case and the S.E.C. matter. O'Neill also represented Goebel during the criminal investigation that led to the indictment of Morris.  O'Neill admits discussing the S.E.C. investigation with Peggy Morris on at least one occasion.  During that discussion, O'Neill advised Peggy Morris on how to file a "Wells" submission in an effort to stop the S.E.C. investigation.  As part of that advice O'Neill provided her with citations and with samples of a "Wells" submission to assist in its filing.  A "Wells" submission is a document filed with the S.E.C. in which a defendant presents the evidence and legal theories he believes the S.E.C. should consider in deciding whether to file an enforcement action.  See 
Securities & Exchange Comm'n v. Sands
, 902 F. Supp. 1149, 1167 (C.D. Cal. 1995), 
aff'd
, 142 F.3d 1186 (9th Cir. 1998).  He also advised Peggy that Edward might want to consider "talking with the government."  O'Neill expressed some reservations about talking with Peggy during this consultation because, he stated, Bryan Cave was not representing Morris, but he provided legal assistance and advice nevertheless. 

C. The Alleged Breach of Fiduciary Duties

During the criminal investigation, Bruce Reppert from the United States Attorney's office sought information from John Goebel.  He informed Daniel O'Neill that Goebel was a "subject" of the criminal investigation.  A "subject" of a federal criminal investigation is "a person whose conduct is within the scope of the grand jury's investigation."  
United States v. Myers
, 123 F.3d 350, 354 (6th Cir. 1997), citing United States Department of Justice Manual §9-11.150 (1992-1 Supp.). 

Goebel participated in interviews with the United States Attorney's office regarding Germania.  The criminal investigators' interviews with Goebel focused on the marketing of "Schnotes," background on Germania, and the financing and raising of capital.  O'Neill represented Goebel during these interviews.  Following the interviews, Goebel was not indicted by the United States Attorney.  Edward Morris and other Germania officers were indicted in the United States District Court for the Southern District of Illinois for their involvement in the "Schnotes" offering.  

When the criminal case went to trial, Dan O'Neill and Thomas Archer attended opening statements.  During opening statements, defense counsel for Edward Morris stated that Morris would rely on the assistance of counsel as a defense to the charge of mail fraud. Morris's attorney told the jury that Morris had relied on the advice of counsel in not authorizing the $9 million loan loss reserve and in not reporting the September Analysis in the "Schnotes" offering circular.  After opening statements, O'Neill discussed Morris's opening statement with Archer and Goebel.  O'Neill then drafted a highly detailed list of proposed cross-examination questions.  These cross-examination questions contained detailed, specific information about the behavior of both Morris and Goebel.  The questions were provided to the prosecutors.

Shortly after the questions were drafted, Peggy Morris discovered them on a computer at Bryan Cave.  She copied the file to a computer disc and gave it to her husband's attorneys. At the request of Edward Morris's defense attorneys, a subpoena was issued on November 4, 1993, requiring Bryan Cave to produce any and all records regarding the proposed cross-

examination questions and all time records related to any representation provided by Bryan Cave to John Goebel.  

On November 8, 1993, Bryan Cave filed a motion to quash the subpoena.  O'Neill and Archer appeared before the federal district court on the matter.  After discussion with Morris's criminal defense attorney and the attorneys of his codefendants outside the presence of the court, the subpoena was withdrawn.  During a colloquy between the criminal defense counsel, O'Neill, Archer, and the court about the subpoena, the issue of whether the questions had been provided to the prosecution was specifically raised.  O'Neill and Archer remained silent and did not answer the question. 

Other matters were also discussed at this hearing.  Morris's criminal defense attorney stated that O'Neill threatened him with federal and state prosecution and a complaint to the state bar association.  O'Neill remained silent when this issue was raised.  Archer denied that threats had been made to Morris's criminal defense counsel, but he stated to the court that O'Neill had informed Morris's criminal defense attorney that O'Neill would "pursue this insofar as his rights allowed." 

II. Analysis

We will now discuss the issues raised in this appeal.  Unless otherwise indicated, a reference to Bryan Cave also includes the individually named partners.

Bryan Cave claimed in the trial court that it was entitled to summary judgment on several grounds.  In this court its position is similar.  Bryan Cave claims that (1) no attorney-

client relationship existed with Morris in regard to Germania matters and thus it owed him no fiduciary duties, (2) the damages sought for his "conviction" and damages for emotional distress are unrecoverable in this action, as a matter of law, (3) that the cross-examination questions Bryan Cave provided to prosecutors could not have caused Morris's conviction as a matter of law, and (4) Morris's claim for emotional distress damages is barred by the statute of limitations.  The trial court, without specifying the basis, stated in its judgment order that it accepted "the reasoning and conclusions" of the defendants and granted summary judgment in favor of all defendants.  Morris appeals.  The standard of review in this case is 
de novo
.  See 
Ordman v. Dacon Management Corp.
, 261 Ill. App. 3d 275, 633 N.E.2d 1307 (1994).

"A motion for summary judgment should only be granted where there is no genuine issue as to a material fact (
Carruthers v. B.C. Christopher & Co.
 (1974), 57 Ill. 2d 376, 313 N.E.2d 457), and this is to be determined by the court from the pleadings, depositions, affidavits, and exhibits in each case (
Hernandez v. Trimarc Corp.
 (1976), 38 Ill. App. 3d 1004, 350 N.E.2d 202).  The purpose of a summary judgment motion is not to litigate a factual issue, and although different inferences may be derived from even undisputed facts, the motion should be granted only where reasonable men could not arrive at different inferences from these undisputed facts.  (
Century Display Manufacturing Corp. v. D. R. Wager Construction Co.
 (1977), 46 Ill. App. 3d 643, 360 N.E.2d 1346 [
rev'd in part on other grounds
, 71 Ill. 2d 428, 376 N.E.2d 993 (1978)].)  In the interpretation of the pleadings, the movant's motion for summary judgment and its supporting documents must be strictly construed and must leave no question as to the movant's right to judgment; conversely, in considering the motion, the respondent's counteraffidavits and supporting documents must be liberally construed.  (
Doran v. Pullman Standard Car Manufacturing Co.
 (1977), 45 Ill. App. 3d 981, 360 N.E.2d 440.)"  
Littrell v. Coats Co.
, 62 Ill. App. 3d 516, 519-20, 379 N.E.2d 293, 296 (1978).

A. The Attorney-Client Relationship

Because the issues raised on appeal turn in large part on the question of whether an attorney-client relationship existed between Edward Morris and Bryan Cave with respect to Germania matters, we begin with that issue.  Morris, relying on 
Doe v. Roe, 
 289 Ill. App. 3d 116, 681 N.E.2d 640 (1997), argues that an attorney-client relationship is a fiduciary relationship.  He further argues that an attorney-client relationship places fiduciary duties upon the attorney which are not limited by the specific terms of the contract of engagement.  See 
Doe
, 289 Ill. App. 3d at 122, 681 N.E.2d at 645; see also 
Abbondanza v. Siegel
, 209 A.D.2d 1023, 619 N.Y.S.2d 896 (1994).

The existence of an attorney-client relationship between Bryan Cave and Morris with respect to estate planning, domestic relations matters, and other personal matters is not contested by Bryan Cave.  Bryan Cave argues, however, that no attorney-client relationship existed between Bryan Cave and Morris regarding Germania.  Relying on 
Latimer v. Perry
, 410 Ill. 119, 128, 101 N.E.2d 531, 535 (1951), it claims that a lawyer "is a fiduciary only with respect to matters within the scope of his agency."  Bryan Cave also cites 
Fielding v. Brebbia
, 479 F.2d 195 (D.C. Cir. 1973), for the proposition that the representation of corporate directors by corporate attorneys on unrelated matters does not create a fiduciary duty to a director with respect to the management of the corporation. 

A fiduciary relationship exists between an attorney and his client as a matter of law. 
In re Imming
, 131 Ill. 2d 239, 252-53, 545 N.E. 2d 715, 721 (1989).  Once established, the attorney-client relationship gives rise to certain duties owed by the attorney to the client without regard to the specific terms of any contract of engagement.  See 
Doe
, 289 Ill. App. 3d at 122, 681 N.E.2d at 645.  Among the fiduciary duties imposed upon an attorney are those of fidelity, honesty, and good faith in the discharge of contractual obligations to, and professional dealings with, a client.  "When, in the course of his professional dealings with a client, an attorney places personal interests above the interests of the client, the attorney is in breach of his fiduciary duty by reason of the conduct."  
Doe
, 289 Ill. App. 3d at 122, 681 N.E.2d at 645.

Bryan Cave points out that Morris was represented by other counsel with respect to Germania-related matters.  Bryan Cave argues that no attorney-client relationship existed between Morris and Bryan Cave because Bryan Cave formally declined representation of Morris in Germania-related matters.  Bryan Cave contends further that Morris did not confide in Bryan Cave attorneys regarding Germania matters.  Bryan Cave claims that it never purported to represent Morris in relation to Germania matters.   

The fact that Morris was represented by counsel other than Bryan Cave with relation to Germania matters, the S.E.C. investigation, and the criminal investigation does not preclude him from having an attorney-client relationship on the same matter with Bryan Cave.  A client may form an attorney-client relationship with more than one attorney or law firm on the same legal matter.  See 
Firkus v. Firkus
, 200 Ill. App. 3d 982, 558 N.E.2d 554 (1990).  Each attorney or law firm representing the client owes the client all of the fiduciary duties arising from an attorney-client relationship.  A law firm is not immune from liability for a breach of fiduciary duty simply because another attorney also owed a fiduciary duty to the client.

Bryan Cave's reliance on 
Fielding
 is unavailing.  
Fielding
 concerns the representation of a corporate director 
only
 on noncorporate legal matters.  In the case at bar, Morris alleges that Bryan Cave represented him on matters unrelated to Germania and on Germania matters.  Furthermore, application of the 
Fielding
 "unrelated matters" rule is inconsistent with Illinois law, as we will explain.

Rule 1.9 of the Illinois Rules of Professional Conduct states: 

"(a) A lawyer who has formerly represented a client in a matter shall not thereafter: 

(1) represent another person in the same or a 
substantially related matter
 in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after disclosure; or 

(2) use information relating to the representation 
to the disadvantage of the former client
, unless:

(A) such use is permitted by Rule 1.6; or

(B) the information has become generally known."  (Emphasis added.)  134 Ill. 2d R. 1.9.

Were Bryan Cave's dealings with Morris sufficient to give rise to an attorney-client relationship with respect to Germania?  If so, then Bryan Cave was ethically barred from using client confidences and secrets in a fashion that would work to Morris's detriment or to the advantage of Bryan Cave or its partners.  

King v. King
, 52 Ill. App. 3d 749, 367 N.E.2d 1358 (1977), was an action for separate maintenance brought by the wife against the husband.  The court awarded the maintenance and ordered the husband to pay the wife's attorney fees.  The husband appealed, claiming he had a preexisting attorney-client relationship with the wife's attorney.  The appellate court found that such a relationship had in fact existed even though the husband had spoken with the attorney for only half an hour two years earlier and had neither retained him nor paid him fees.  The key was that the husband had consulted the attorney regarding marital difficulties, and the consultation was substantially related to the issue of separate maintenance.

Similarly, in 
Herbes v. Graham
, 180 Ill. App. 3d 692, 536 N.E.2d 164 (1989), the plaintiffs appealed from an order disqualifying their attorney on the basis of a conflict arising from alleged prior representation.  The 
Herbes
 court, in discussing the creation of the attorney-client relationship, stated:

"Taken together, the cases teach that an attorney-client relationship need not be explicit or expressed and is not dependent on the amount of time the client spends with the attorney, the payment of fees or execution of a contract, the consent of the attorney, or the actual employment of the attorney.  (
Westinghouse Electric Corp. v. Kerr-McGee Corp.
 (7th Cir. 1978), 580 F.2d 1311, 1319;
 Hughes v. Paine, Webber, Jackson & Curtis, Inc.
 (N.D. Ill. 1983), 565 F. Supp. 663, 667 n.10, 669.)  Rather, the relationship can come into being during the initial contact between the layperson and the professional and appears to hinge on '"the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice."'  (
Westinghouse
, 580 F.2d at 1319, quoting McCormick, Evidence §
88, at 179 (2d ed. 1972).)  Like 
King
, the Federal cases focus on the client's viewpoint rather than that of the attorney.  If the client consults the attorney for the evident purpose of securing legal advice, an attorney-client relationship will probably be found regardless of the attorney's intent or the fact that a further relationship did not develop as a result of the primary consultation."  180 Ill. App. 3d at 699, 536 N.E.2d at 168.

Once a substantial relationship is found between the prior and present representations, it is irrebutably presumed that confidential information was disclosed in the earlier representation.  See 
Herbes
, 180 Ill. App. 3d at 700, 536 N.E.2d at 168; 
Weglarz v. Bruck
, 128 Ill. App. 3d 1, 6, 470 N.E.2d 21 (1984).  

The duty to maintain confidences and secrets may be present even in the absence of the attorney-client relationship.  This is to preserve the interest in candor and openness.  

"At the inception of the contacts between the layman and the lawyer it is essential that the layman feel free of danger in stating facts of the case to the lawyer whom he consults.  Even though the lawyer rejects the case and the relation of attorney and client never arose, the usual duties as to privileged communications and conflicting interest should apply."  Patterson & Cheatham, The Profession of Law 246 (1971).

The principle was well stated by our supreme court over 85 years ago:

"The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties.  When he has once been retained and received the confidence of a client, he cannot enter the service of those whose interests are adverse to that of his client or take employment in matters so closely related to those of his client or former client as in effect to be a part thereof.  [Citations.]  *** It is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with absolute assurance that that lawyer's tongue is tied from ever discussing it."  
People v. Gerold
, 265 Ill. 448, 477-78, 107 N.E. 165 (1914). 

The brief filed by Bryan Cave on this issue, no doubt in all good faith, is misleading and just plain wrong.  
Lattimer v. Perry
, 410 Ill. 119, 128, 101 N.E.2d 531, 535 (1951), is cited for the proposition that an attorney-client relationship, like other agency relationships, gives rise to fiduciary duties only within the scope of the agency.  The problem is that the 
Lattimer
 case does not deal with attorney-client relationships.  It is a case dealing with a common principal/agent question.  Moreover, unable to find Illinois law to support their position, Bryan Cave cites Missouri law.  The authorities cited and quoted previously in this decision demonstrate that the duties of an attorney to his client go far beyond a common principal/agent relationship.  Furthermore, 
Lattimer
 itself distinguishes between cases in which an agent provides advice and counsel to a principal and cases in which no counsel is provided by the agent.  
Lattimer
, 410 Ill. at 127-28, 101 N.E.2d at 535.  Bryan Cave's authorities are neither helpful nor pertinent.  See 
Herbes
, 180 Ill. App. 3d at 700, 536 N.E.2d at 168.

ACTA NON VERBA
!  (Deeds not words!) Bryan Cave's denial of an attorney-client relationship with Morris conflicts with the admitted facts.  By their own admission they aided in the preparation of a "Wells" submission.  Bryan Cave admits that they met with Morris and discussed the Germania problem, and he asked them to represent him.  In his deposition, Morris was asked the following question and gave the following answer.

"Q.  No, sir.  Here, so we get to the nub of this, I mean, you have made certain allegations here about a disclosure of confidential information, as I understand it, and the word 'confidential' is used in the lawsuit that you filed.  So, I'm asking you now to give me your recollection as to what the confidential information was that you related to Bryan, Cave regarding your activities as an officer of Germania.

A.  As far as I'm concerned, everything that I talked to Jack Goebel about, or other members of Bryan, Cave, with respect to Germania's activities, my activities, were [
sic
] all confidential, and those--those discussions were ongoing from the time Bryan, Cave represented the bank and Jack Goebel was a director, through, you know, we stopped talking."

It must be remembered that Morris had been represented previously by Bryan Cave on a variety of personal matters over a period of several years.  Whom does a person consult on a legal problem when it arises?  His attorney.  Whom did Morris meet with to request representation on the Germania matter?  Bryan Cave, of course.

The key to the creation of the relationship is not any belief on the part of Bryan Cave about whether an attorney-client relationship was formed.  "Rather, the relationship can come into being during the initial contact," and its creation hinges on "'the client's belief that he is consulting a lawyer in that capacity ***.'"  
Herbes
, 180 Ill. App. 3d at 699, 536 N.E. 2d at 168, quoting McCormick, Evidence §88, at 179 (2d ed. 1972).  Even a brief meeting, resulting in no formal retainer or payment of fees, is sufficient to create the relationship.  See 
King
, 52 Ill. App. 3d 749, 367 N.E.2d 1358.  Once the relationship is formed, it is  
irrebutably presumed
 that confidences were passed.  See 
Herbes
, 180 Ill. App. 3d at 700, 536 N.E.2d at 168.  

The record fails to show what took place when Morris and Goebel met and Morris asked for representation.  If in seeking counsel Morris had substantive conversations with Goebel on the Germania matter, then as a matter of law an attorney-client relationship came into being.  At the very least, based on the record before us, we cannot say that no attorney-

client relationship was formed.  Therefore, summary judgment should not have been granted on this basis.

B. The Alleged Breach of Fiduciary Duties

Among the fiduciary duties owed by the attorney to the client are the duties of fidelity, honesty, and good faith.  The attorney's fiduciary duties are breached when an attorney places his own interests above those of the client.  See 
In re Rosin
, 118 Ill. 2d 365, 515 N.E.2d 85 (1987). 

Relying on Illinois Rule of Professional Conduct 1.6(c)(3) (134 Ill. 2d R. 1.6(c)(3)) and 
Williams v. Preman
, 911 S.W.2d 288, 302 (Mo. Ct. App. 1995), 
overruled on other grounds by Klemme v. Best
, 941 S.W.2d 493, 496 (Mo. 1997), Bryan Cave alleges it was free to disclose any confidences it might have learned from Morris to defend itself against an accusation of wrongful conduct.  It finds such an accusation in the opening statement of Morris's attorney, where the advice-of-counsel defense was mentioned.  The record fails to disclose what was said in this opening statement.  In any event, we disagree that a statement by counsel in an opening statement that the advice of counsel will be relied on as a defense is sufficient to waive the attorney-client privilege.  Such a statement standing alone without evidence to support it would not authorize a jury instruction in the criminal prosecution on the advice-of-counsel defense.  It is fundamental that opening statements and remarks of counsel are not evidence.  See 
People v. Flax
, 255 Ill. App. 3d 103, 627 N.E.2d 359 (1993); 
United States v. Hall
, 165 F.3d 1095, 1116 (7th Cir. 1999). 

Only the client can waive the attorney-client privilege.  The waiver must be express and knowing.  Even if counsel discloses a confidence in the presence of the client and the client sits mute, the privilege is not waived unless the client expressly consented.  See 
Chavez v. Watts
, 161 Ill. App. 3d 664, 515 N.E.2d 146 (1987).  

Bryan Cave admits that the advice-of-counsel defense was never the subject of any testimony by Morris.  Moreover, while Bryan Cave may have been justified in defending itself if an accusation of wrongful conduct was made, it was not permitted to become an advocate for the prosecution and an adversary to Morris.  See 134 Ill. 2d R. 1.9(a)(2).  We agree with the reasoning of the court in 
Williams
 that while the advice-of-counsel defense may waive the attorney's duty to maintain confidences, "it does not destroy the duty of loyalty an attorney owes to his client."  911 S.W.2d at 301.  

The preparation of proposed cross-examination questions for the prosecution was unquestionably intended to undermine Morris's anticipated testimony.  As stated previously, all inferences favorable to the party opposing summary judgment must be indulged.  A reasonable inference is that Goebel and Bryan Cave aided the United States Attorney's office in an effort to curry favor and protect themselves.  Goebel, who was a "subject" of the investigation, was never prosecuted. 

We are unable to tell from the briefs of the parties if Goebel testified for the government in its case in chief against Morris.  If he did so, the act of testifying, like the act of drafting cross-examination questions for use by the prosecution, would have preempted Morris from testifying to the advice-of-counsel defense.  If an attorney-client relationship existed between Bryan Cave and Morris, Goebel's testimony under these circumstances was yet another breach of the duty of loyalty and a betrayal of the client.

C. The Actual Innocence Rule

The next issue concerns the question of whether Morris, as an element of this claim against Bryan Cave for breach of fiduciary duty, must prove "actual innocence," as we required in the context of a criminal defendant's legal malpractice action against his former attorney based on negligence.  See 
Moore v. Owens
, 298 Ill. App. 3d 672, 698 N.E.2d 707 (1998); see also 
Kramer v. Dirksen
, 296 Ill. App. 3d 819, 695 N.E.2d 1288 (1998).  Bryan Cave claims that the rule announced in these cases is dispositive.  Morris agrees that these cases are dispositive if applicable.  Morris asks this court to reconsider the 
Moore
 decision.  The facts of this case present no opportunity for us to reconsider 
Moore
 and the "actual innocence" rule.  We also decline to apply the "actual innocence" rule to this case.  

In this case we are not confronted with a traditional malpractice claim.  If Morris had an attorney-client relationship with Bryan Cave, then this case is about 
Betrayal
!  To apply 
Moore
 to a situation where a criminal defense attorney intentionally works to insure his client's conviction would be unconscionable.  This would allow counsel for the defendant to urge the jury in closing argument to convict his client.  Then the same traitorous attorney could defend an action filed by his former client with the plea:  "Well, you were guilty, weren't you?"  We will not adopt such a policy.  
Moore
 and its "actual innocence" rule will not be applied to situations where an attorney wilfully or intentionally breaches the fiduciary duties he owes to his criminal defense client.  Whether the "actual innocence" rule should continue to be the law in a 
Moore
 setting must await another day when a case properly involving that issue comes before us.

D. Emotional Distress Damages

As to the claim that emotional distress damages are not recoverable in this case, we disagree.  We believe that the reasoning of 
Doe v. Roe
, 289 Ill. App. 3d 116, 681 N.E.2d 640 (1997), is sound.  We agree with 
Doe
 that when an attorney has reason to know that a breach of fiduciary duty is likely to cause emotional distress, damages will be given for mental suffering.  We believe that under 
Doe
, if Morris otherwise proves his case, damages for emotional distress should be and are recoverable. 

E. The Denial of Causation

Bryan Cave argues that the fact that it provided cross-examination questions to the prosecution could not have caused Morris's conviction.  The claim is pure argument without citation to authority.

It is well established that a court of review is entitled to have briefs submitted that are articulate and organized and present cohesive legal argument in conformity with our Supreme Court rules.  See 
Schwartz v. Great Central Insurance Co.
, 188 Ill. App. 3d 264, 268, 544 N.E.2d 131, 133 (1989).  A reviewing court is also entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; arguments inadequately presented on appeal are waived.  See 
Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.
, 118 Ill. 2d 389, 401, 515 N.E.2d 1222, 1227 (1987).  Mere contentions without citation of authority do not merit consideration on appeal.  See 
Fuller v. Justice
, 117 Ill. App. 3d 933, 942, 453 N.E.2d 1133, 1139 (1983); 155 Ill. 2d R. 341(e)(7).

F. Statute of Limitations

Finally, Bryan Cave argues that this action is barred by the statute of limitations.  It claims that Morris was aware of the proposed cross-examination questions it prepared either on or before November 8, 1993.  The complaint in this case was filed November 10, 1995.  The statute of limitations for legal malpractice is two years.  735 ILCS 5/13-214.3(b) (West 1996).

Morris responds while the two-year limitation period first became effective in 1991, it was amended in 1995 as part of the tort reform legislation passed by the legislature.  This tort reform legislation was declared unconstitutional in 
Best v. Taylor Machine Works
, 179 Ill. 2d 367, 689 N.E.2d 1057 (1997).  Thus, Morris argues that with the demise of the amended attorney malpractice statute of limitations, the five-year period as specified in section 13-205 of the Code of Civil Procedure (735 ILCS 5/13-205 (West 1996)), dealing with actions not otherwise provided for, became applicable.  Bryan Cave responds that when the 1995 amended statute was held unconstitutional, the earlier version was revived.  See 
Van Driel Drug Store, Inc. v. Mahin
, 47 Ill. 2d 378, 265 N.E.2d 659 (1970).  We agree with Bryan Cave that when our supreme court in 
Best
 declared the tort reform legislation unconstitutional the previous limitation statute was reinstated.  We disagree that the attorney malpractice statute applies to this case. 

"'It is the prevailing rule that, as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act; and that mere silence on his part as to a cause of action, the facts giving rise to which it was his duty to disclose, amounts to a fraudulent concealment ***.'"  
Chicago Park District v. Kenroy, Inc.
, 78 Ill. 2d 555, 562, 402 N.E.2d 181 (1980), quoting Annot., 173 A.L.R. 576, 588 (1948).

The statute of limitations for fraudulent concealment is five years from the date that  the fraud is discovered.  735 ILCS 5/13-215 (West 1996).  If Bryan Cave had an attorney-

client relationship with Morris, then the act of secretly providing cross-examination questions or other assistance to the United States Attorney would constitute a breach of the duty of loyalty.  Because the act was secret, it would be a fraudulent concealment.  See 
Kenroy
, 78 Ill. 2d 555, 402 N.E.2d 181.  Thus, the statute of limitations has not expired.

Conclusion

Accordingly, the order of the circuit court granting summary judgment in favor of Bryan Cave, LLP, John Goebel, Daniel O'Neill, J. Thomas Archer, and Alan J. Dixon is reversed, and the cause is remanded.

Reversed and remanded.

KUEHN and HOPKINS, JJ., concur.