In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2012

UFT COMMERCIAL FINANCE, LLC, and JOANNE M. NOREN,
also known as Joanne Marlowe, individually,

*Plaintiffs-Appellants*,

*v.*

RICHARD A. FISHER,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-CV-07669 — **Charles P. Kocoras**, *Judge*.

ARGUED JANUARY 15, 2021 — DECIDED MARCH 23, 2021

Before SYKES, *Chief Judge*, and WOOD and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This is a legal malpractice case. Plaintiffs are a start-up company and its founder. They have sued the company's former chief legal officer, Richard Fisher, to recover losses from an arbitration award that held them liable for years of unpaid wages owed to Fisher himself. The plaintiffs' core allegation is that they would not have been

found liable to Fisher if he had not advised them to enter into what they now say was an illegal agreement to defer Fisher's own compensation until the company was able to secure more funding. The district court granted Fisher's motion to dismiss for a variety of reasons that together foreclosed the plaintiffs' malpractice claims. On appeal, the plaintiffs challenge only two of the district court's reasons. We affirm. Even if the plaintiffs were correct on both issues, their claims still could not survive the motion to dismiss.

I.  *Factual and Procedural Background*

Since this appeal is from a grant of a motion to dismiss for failure to state a claim, we present the following facts as they are pled in the complaint. Plaintiff UFT is a commercial finance company founded by plaintiff Joanne Marlowe in 2008. Defendant Richard Fisher worked as a consultant with UFT from February 2013 to September 2013 and then became employed by UFT as its chief legal officer in October 2013.

Throughout his employment, Fisher was the sole source of legal counsel to UFT and Marlowe regarding the company's operations. Among other duties, Fisher drafted the employment agreements between UFT and its employees, including both Marlowe's and his own. These employment agreements included mandatory arbitration clauses.

During Fisher's time at UFT, the company's revenues were inconsistent, coming in "fits and starts," so that the company failed to pay Marlowe, Fisher, and all other employees their agreed salaries when they were due. Fisher and other employees continued to work at the company because they believed in its potential. Still, at various times, Fisher recommended and drafted "supplemental agreements" allowing for the

accrual of wages owed to various employees who could not be paid on schedule due to UFT's revenue patterns. Following Fisher's advice, even Marlowe herself entered into one of these supplemental agreements with UFT in 2014. And Fisher signed one in January 2016. Fisher's supplemental agreement said he was owed $330,000, which was to "be paid in full from any subsequent first closing of any permanent equity/debt placement by [UFT] in an amount greater than US $1,000,000, if not paid earlier from any other source." Fisher did not advise UFT to consult independent counsel when negotiating his own supplemental and employment agreements. Plaintiffs also allege that when UFT was considering buying Directors and Officers (D&O) liability insurance in 2014, Fisher advised Marlowe against it and did not fully inform Marlowe or UFT of the liability protections afforded by D&O insurance.

In August 2016, Fisher left UFT on bad terms after negotiations with Marlowe over his contract renewal broke down. In January 2018, to recover his unpaid wages from his years at UFT, Fisher demanded arbitration before the American Arbitration Association. On January 2, 2019, an arbitrator found that Fisher's wages had been illegally withheld throughout his employment because the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq., "imposes strict time limits on when wages … must be paid." Dkt. 7-1, 8. The arbitrator held UFT and Marlowe jointly and severally liable to Fisher for unpaid wages and statutory penalties totaling $864,976. The arbitrator also held UFT liable for an additional $366,460 because Fisher did not receive written notice of his contract nonrenewal, which entitled Fisher to be paid for another three-year contract term, whether earned or not.

Plaintiffs have not paid the arbitration award. Instead, in an attempt to avoid these losses, the plaintiffs now point the finger back at Fisher in this highly unusual lawsuit. Plaintiffs sued Fisher in an Illinois state court alleging that Fisher's own legal malpractice caused them to take the actions that triggered their liability to him under the arbitration award. More specifically, the plaintiffs allege that Fisher negligently failed to advise them on (1) the legality and consequences of their employment and supplemental agreements, and the mandatory arbitration clauses therein; (2) Fisher's conflict of interest in executing his own supplemental agreement; (3) the benefits of independent counsel when negotiating Fisher's own agreements; and (4) the benefits of purchasing D&O insurance.[1]

---

[1] It is rare but not completely unprecedented for an employer to sue its own employee for negligent acts taken within the scope of his employment. See *Withhart v. Otto Candies, LLC*, 431 F.3d 840, 845 (5th Cir. 2005) (maritime shipping employer allowed to sue employee for negligently causing property damage); *Nordgren v. Burlington N. R.R.*, 101 F.3d 1246, 1253 (8th Cir. 1996) (Federal Employers Liability Act did not preempt railroad's state-law counterclaims against employees for property damage); *Stack v. Chicago, Milwaukee, St. Paul & Pac. R.R.*, 615 P.2d 457, 459 (Wash. 1980) (railroad had common-law right to sue employees for property damage); see generally Restatement of Employment Law § 8.01 (Am. L. Inst. 2015). The economics of such claims are rarely promising (apart from counterclaims), and state laws often require employers to indemnify employees for damages caused on the job even when the employee acted negligently. See, e.g., Cal. Labor Code § 2802(a) ("An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.").

Illinois' employee indemnification law, however, first took effect in 2019 and does not cover negligent activity—meaning that the plaintiffs in

Fisher removed the case to federal court under 28 U.S.C. § 1441(b) based on diversity of citizenship. (Fisher is a Georgia citizen; plaintiffs are Illinois citizens.) The district court granted Fisher's Rule 12(b)(6) motion to dismiss, finding that: (1) any malpractice related to Fisher's original employment agreement was barred by Illinois' statute of repose; (2) Fisher owed no duty to plaintiff Marlowe because he formed no attorney-client relationship with her individually; (3) plaintiffs did not sufficiently plead that Fisher's legal advice proximately caused them to use the supplemental agreements, refuse independent counsel, or forgo D&O insurance; and (4) plaintiffs have not alleged any damages stemming from contracts with any employees other than Fisher. See *UFT Commercial Finance, LLC v. Fisher*, 2020 WL 2513097 (N.D. Ill. May 15, 2020). Together, these findings foreclosed all of plaintiffs' malpractice claims.

---

this case still have an incentive to sue Fisher for malpractice. See 820 ILCS 115/9.5(a) (2019) ("An employer shall reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment …. *An employer is not responsible for losses due to an employee's own negligence*….") (emphasis added). Thus, depending on state law and private agreements, it is at least possible for in-house counsel to face malpractice claims brought by their employers. See, e.g., *Kaye v. Rosefielde*, 432 N.J. Super. 421, 478–83 (App. Div. 2013) (allowing malpractice claim by employer against its general counsel), *rev'd on other grounds*, 223 N.J. 218 (2015). In fact, insurance companies offer "Employed Lawyers" liability policies that cover such situations. See, e.g., Chubb Insurance Co., *Employed Lawyers Professional Liability*, https://www.chubb.com/us-en/business-insurance/employed-lawyers-professional-liability.html (covering in-house counsel's "Defense of claims brought by the organization").

II. *Discussion*

Plaintiffs' appeal targets only two of the district court's findings. First, plaintiffs argue that Fisher owed a duty to Marlowe, both as an individual client and as an intended beneficiary of his services to UFT. Second, plaintiffs argue that they did not need to plead proximate cause as to the supplemental agreements because Fisher's advice to use such agreements was "in itself improper." See *Metrick v. Chatz*, 266 Ill. App. 3d 649, 654–55, 639 N.E2d 198, 202 (1994). Even if the plaintiffs were correct on both issues, their claims still fail.

A. *Duty to Marlowe*

We review de novo, meaning without deference, the district court's dismissal under Rule 12(b)(6), accepting the plaintiffs' factual allegations as true and asking only whether they present "a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In this diversity case, Illinois' substantive law governing legal malpractice applies. *Great West Cas. Co. v. Robbins*, 833 F.3d 711, 715 (7th Cir. 2016), citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

The elements of legal malpractice in Illinois are "(1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause; and (4) damages." *TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.*, 444 F.3d 587, 590–91 (7th Cir. 2006), citing *Lopez v. Clifford Law Offices*, 362 Ill. App. 3d 969, 974–75, 841 N.E.2d 465, 470–71 (2005) (collecting Illinois cases). The client's reasonable belief rather than the attorney's words or actions ultimately controls whether an attorney-client relationship has been formed. See *Morris v. Margulis*, 307 Ill. App. 3d 1024, 1037, 718 N.E.2d 709,

719 (1999), *rev'd on other grounds*, 197 Ill. 2d 28, 754 N.E.2d 314 (2001); Restatement (Third) of the Law Governing Lawyers § 14 (Am. L. Inst. 2000). An attorney's duty normally extends only to the client, but "if a nonclient is an intended third-party beneficiary of the relationship between the client and the attorney, the attorney's duty to the client may extend to the nonclient as well." *In re Estate of Powell*, 12 N.E.3d 14, 20 (Ill. 2014). The third party "must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." *Id.*, quoting *Pelham v. Griesheimer*, 92 Ill. 2d 13, 21, 440 N.E.2d 96, 100 (1982).

Plaintiffs argue that Marlowe was in fact Fisher's client on certain matters where he advised her personally and that he otherwise owed her a duty as an intended beneficiary of his attorney-client relationship with the company, UFT. Plaintiffs argue that Marlowe reasonably believed that Fisher was her lawyer when he personally drafted and advised her on her own supplemental agreement with UFT and when he advised her to forgo D&O insurance. Plaintiffs further claim that Fisher owed Marlowe a duty when drafting his own supplemental agreement with UFT because Marlowe was the intended third-party beneficiary of Fisher's agreement.

Even if we assume for purposes of argument that Marlowe was Fisher's client regarding her own supplemental agreement and the D&O insurance decision, plaintiffs have failed to plead any plausible malpractice claims arising from those matters. On appeal, the plaintiffs have not challenged the district court's separate finding that the complaint failed to plead that forgoing D&O insurance proximately caused any loss from the arbitration award. See *UFT Commercial Finance*, 2020 WL 2513097, at *7 ("Plaintiffs have failed to plead proximate

cause with regards to … D&O Insurance….”). Plaintiffs also do not challenge the finding that, since the arbitration concerned only Fisher's unpaid wages, the complaint does not plead any damages from UFT's agreements with other employees, including Marlowe. Thus, even if we assumed that Marlowe was a client with respect to her own agreements with UFT and the D&O insurance decision, the district court's other unchallenged findings on proximate cause and damages foreclose any viable malpractice claims arising from those matters. As to plaintiffs' argument that Marlowe was an intended beneficiary of Fisher's supplemental agreement, we explain next why, even if that were true, plaintiffs' claims regarding Fisher's agreement still fail.

B. *Proximate Causation Regarding Supplemental Agreements*

The plaintiffs' second challenge on appeal is that the district court erred in finding that the complaint failed to plead proximate causation as to Fisher's supplemental agreement. The district court found that proximate causation had not been pled because “Plaintiffs do not allege that they would have opted against using the supplemental agreements … had Fisher fully advised them.” *UFT Commercial Finance*, 2020 WL 2513097, at *7. Plaintiffs say they did not need to plead causation as to the supplemental agreements because, under Illinois law, causation is assumed if the attorney's recommended conduct is itself illegal. See *Metrick*, 266 Ill. App. 3d at 655, 639 N.E.2d at 202 (“[T]o establish the element of proximate cause, it is necessary for the client to both plead and prove that had the undisclosed risk been known, he or she would not have accepted the risk …. *Such is not the case, however, when the course of action the attorney recommends is in itself improper under the circumstances presented*.”) (emphasis added).

But even if the plaintiffs are right about this legal rule, it could help them only if Fisher in fact recommended illegal conduct. He did not, and the arbitrator's ruling puts that point beyond reasonable factual dispute. We may consider the arbitrator's ruling on a motion to dismiss because it is so central to the complaint. E.g., *Williamson v. Curran*, 714 F.3d 432, 435–36 (7th Cir. 2013) (collecting cases and affirming dismissal based on such documents); *Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013) (same).

The plaintiffs contend that causation should be assumed with respect to Fisher's supplemental agreement because the arbitrator found it was an illegal "deferred compensation agreement" (DCA) under the Illinois Wage Payment and Collection Act. According to the plaintiffs, the agreement was illegal because Fisher disclaimed his right to payment until the company received more funding, which violated the Act's prohibition against "any release or restrictive endorsement required by an employer as a condition to payment," 820 ILCS 115/9. Plaintiffs also say that's how the arbitrator read the agreement.

Plaintiffs misread both the agreement and the arbitrator's award. The arbitrator most definitely did not find that Fisher's supplemental agreement was an illegal deferred compensation agreement. On the contrary, he explicitly rejected that argument. He found that the intent and effect of the agreement were merely to confirm UFT's accrued payment obligation to Fisher:

> Both Respondents admit that Fisher is due unpaid wages for the time he performed services for UFT. However, they vigorously contend that by executing the DCA [Deferred Compensation

Agreement], Fisher agreed that the *sole source of payment* for his 2014 and 2015 wages was to be an infusion of outside capital.… There are several problems with this argument.

The document, itself, supported by Fisher's testimony, shows from its title and subtitle that Fisher's purpose in creating it was to confirm the amount of wages he was owed for 2014 and 2015. The DCA records the parties' agreement that UFT owed him $330,000 for those years. The DCA further says that it was "… an acknowledgment of a payment obligation … and constitutes an agreement as to the total amount due to the Employee as of December 31, 2015" and further, that it does not affect Fisher's other rights under the EA. Nothing in the document suggests that it was intended by the parties to be an amendment to the [original Employment Agreement]. Also, by its clear language, the DCA contemplated that Fisher's compensation could be "… earlier paid from any other source."

Dkt. 7-1, 10–11 (emphasis in original).

Fisher argues that this finding by the arbitrator deserves issue-preclusive effect. That is unlikely because arbitration awards are not required by statute to have issue-preclusive effect in federal courts, *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 477 (1982), and the Supreme Court has often denied the need to judicially fashion rules to that effect. See *McDonald v. City of West Branch*, 466 U.S. 284, 288–89 (1984) (in § 1983 action, federal courts should not afford claim- or issue-preclusive effect to arbitration award), citing *Alexander v. Gardner–*

*Denver Co.*, 415 U.S. 36, 55–56 (1974) (same for Title VII action), and *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 745–46 (1981) (same for Fair Labor Standards Act claims).

With or without issue preclusion, the arbitrator was clearly correct on the merits. UFT violated the Act by failing to pay Fisher as agreed. The supplemental agreement did not aggravate or add to those violations. It merely memorialized the parties' agreement as to how much the company owed him and the company's commitment to pay him from any new capital it could raise in an amount over $1 million. When the parties entered into the supplemental agreement, Fisher presumably had a slam-dunk case under the Act but no potential defendant that he was willing to sue and that would have been in a position to pay a judgment. The agreement makes sense as an interim measure to forestall litigation by acknowledging the obligation and committing the company to one way to satisfy it, if it could raise new capital.

The agreement did not disclaim any right to payment. It said instead that Fisher still could and should be "earlier paid from any other source." And the title of the agreement— "Compensation Owed Richard Fisher ('Employee') for 2014-2015 under Employment Agreement dated October 1, 2013"— helps to confirm that its purpose was to confirm the accrued amount owed to Fisher.

As a result, we reject the plaintiffs' assertion that proximate cause can be assumed with respect to this agreement. Rather, the plaintiffs needed to plead facts plausibly showing that, if Fisher had not recommended the supplemental agreements, the plaintiffs would have taken a different course of action that would have avoided their liability to Fisher. The district court correctly found that the plaintiffs did not plead

such facts. For instance, the plaintiffs have not pled that without the supplemental agreements they would have timely paid Fisher's wages during his employment or that they would have fired him to prevent the accumulation of his wages. The plaintiffs have thus failed to plead causation as to the supplemental agreements. Plaintiffs also have not challenged the court's similar findings as to the D&O and independent counsel decisions. So the district court's proximate causation analysis remains unscathed: "Plaintiffs have failed to plead proximate cause with regards to the supplemental agreements, D&O Insurance, and independent counsel." *UFT Commercial Finance*, 2020 WL 2513097, at *7.

That failing, coupled with the unchallenged findings on damages, forecloses all of plaintiffs' malpractice claims regarding the supplemental agreements, the original employment agreements, and the D&O insurance decision. The judgment of the district court is AFFIRMED.