PERRY B. OWENS, Plaintiff-Appellant, v. McDERMOTT, WILL AND EMERY et al., Defendants-Appellees.

First District (2nd Division)   No. 1—99—0677

Opinion filed August 29, 2000.

William M. McErlean and Peter G. Hallam, both of Seidler & McErlean, of Chicago, for appellant.

Stephen Novack and Bruce Braverman, both of Novack & Macey, of Chicago, for appellees.

JUSTICE McBRIDE delivered the opinion of the court:

The following appeal arises over the interpretation of a settlement agreement entered into by plaintiff Perry B. Owens (Owens) and Owens' former company, Utilities Inc. (Utilities). The settlement agreement was reached after a dispute arose between Owens and the senior management and directors of Utilities. Prior to his departure Owens was the chief executive officer of Utilities, a private water utility company he had formed in 1965. In 1988, Owens divorced his wife and was represented in the divorce proceedings by Jon Lind of McDermott, Will and Emery. Lind and McDermott, Will and Emery (collectively defendants) are the defendants in the instant action. As part of the divorce decree and per defendants' advice, Owens' former wife received 32,000 shares of Utilities stock, with the proviso that Owens be allowed the right of first refusal to purchase the stock should his former wife choose to sell it.

In 1996, eight years after his divorce, Owens was forced from his position as chief executive officer of Utilities by the board of directors and the remaining senior management. To avoid litigation over his departure Owens entered into a series of three agreements which outlined his separation from Utilities. Defendants represented Utilities in this matter. One of these agreements was a voting agreement between Owens and Utilities. It is section 4 of the voting agreement that is at issue in the instant appeal. Section 4 of the voting agreement states in pertinent part:

> "*Acquisition of Securities.* During the Restriction Period, except (a) by way of stock dividend, stock split, reorganization, recapitalization, merger, consolidation or other like distributions made available to holders of Company Voting Securities generally or (b) as specifically permitted by the terms of this Agreement, the Separation Agreement or the Supplemental Share Agreement, the Shareholder will not acquire, or agree, offer or seek or propose to acquire, directly or indirectly, alone or in concert with any other Person, by purchase or otherwise, or exercise any attribute of beneficial ownership (as defined on the date hereof in Rule 13d—3 of the Securities and Exchange Commission under Section 13(d) of

the Act) with respect to, any securities of the Company, or direct or indirect rights or options to acquire (through purchase, exchange, conversion or otherwise) any securities of the Company or any of the assets or businesses of the Company. The Shareholder acknowledges and agrees that any securities of the Company acquired by the Shareholder after the date hereof in accordance with this Section 4 will be subject to this Agreement and to the Proxy."

The agreement was executed on December 23, 1996. In April 1997, Owens assigned his right of first refusal to his nephew. Later that year, Owens' former wife sought to sell her shares of Utilities and spoke with defendants about this matter. Defendants, acting on behalf of Utilities, arranged for the removal of the stock restriction appearing on the stock certificates which were originally placed on all of his ex-wife's shares at the time of the divorce. These stocks were then sold to someone other than Owens. After learning of the sale of the stock, Owens rescinded the assignment of his right of first refusal to his nephew.

In October 1997, Owens filed a complaint against defendants alleging that they breached their fiduciary duty to him as a former client and tortiously interfered with his right of first refusal to purchase his former wife's stock when they facilitated the removal of the restrictive stock legend from the stock certificates. In addition to these two counts, Owens' original complaint contained one count of slander against his former wife. The defendants filed a motion to dismiss Owens' complaint pursuant to section 2—619(a) of the Code of Civil Procedure (735 ILCS 5/2—619(a) (West 1996)) and Owens' former wife filed a motion to dismiss under section 2—615 (735 ILCS 5/2—615 (West 1996)). On May 13, 1998, defendants' motion to dismiss was granted with respect to counts I and II. Owens' ex-wife's count was also dismissed and is not the subject of this appeal. Owens subsequently filed an amended complaint. Thereafter, the trial court dismissed the amended complaint finding that once Owens entered into the voting agreement with Utilities, Owens could no longer exercise his right of first refusal.

On appeal, Owens raises three claims. First, Owens claims that the voting agreement unambiguously gives him the right to purchase his former wife's shares of stock. Second, Owens alternatively asserts that the voting agreement is ambiguous and thus raised issues of genuine material fact that precluded dismissal of counts I and II of his complaint. Third, Owens contends that the claim for breach of fiduciary duty can survive independently of the trial court's determination that Owens' right of first refusal ceased to exist after the signing of the voting agreement.

A motion to dismiss under section 2—619 (735 ILCS 5/2—619 (West 1996)) "allow[s] for a threshold disposition of questions of law and easily proven issues of fact." *Jo Lou Mio v. Alberto-Culver Co.*, 306 Ill. App. 3d 822, 824, 715 N.E.2d 309 (1999). Under section 2—619 a motion to dismiss should be granted if, after construing the pleadings and supporting documents in the light most favorable to the non-moving party, the trial court finds that no set of facts can be proved upon which relief could be granted. *Jo Lou Mio*, 306 Ill. App. 3d at 825. This process does not require the trial court to weigh facts or determine credibility and, as a result, this court does not defer to the trial court's judgment. *Jo Lou Mio*, 306 Ill. App. 3d at 825. Therefore, upon review we consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal was proper as a matter of law. *Jo Lou Mio*, 306 Ill. App. 3d at 825. Like motions to dismiss under section 2—615 (735 ILCS 5/2—615 (West 1996)), we review motions to dismiss under section 2—619 *de novo*. *Lykowski v. Bergman*, 299 Ill. App. 3d 157, 164, 700 N.E.2d 1064 (1998).

■ Although Owens characterizes the first issue as whether he waived his right of first refusal to purchase his former wife's stock, we believe the question is whether the voting agreement constituted a contract that, once entered into, barred Owens from acquiring any stock in Utilities during the 10-year limitation period set out in that agreement. In construing the provisions of a contract, the court's primary objective is to give effect to the intent of the parties at the time the contract was made. *Pennsylvania Life Insurance Co. v. Pavlick*, 265 Ill. App. 3d 526, 529, 637 N.E.2d 1160 (1994). Such intentions are to be ascertained from the language of the contract. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34, 628 N.E.2d 1165 (1993). If the language in the contract is clear and unambiguous, the judge must determine the intention of the parties " 'solely from the plain language of the contract' and may not consider extrinsic evidence outside the 'four corners' of the document itself." *Omnitrus*, 256 Ill. App. 3d at 34, quoting *Tishman Midwest Management Corp. v. Wayne Jarvis, Ltd.*, 146 Ill. App. 3d 684, 689. See *Meyer v. Miglin, Inc.*, 273 Ill. App. 3d 882, 888, 652 N.E.2d 1233 (1995) (stating "[i]f the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract, as a matter of law"). Moreover, " '[c]lear and unambiguous contract terms must be given their ordinary and natural meaning' and contracts must be interpreted 'as a whole, giving meaning and effect to each provision thereof.' " *Omnitrus*, 256 Ill. App. 3d at 34, quoting *Srivastava v. Russell's Barbecue, Inc.*, 168 Ill. App. 3d 726, 730, 523 N.E.2d 30 (1988).

Owens argues that the failure of Utilities to address his right of first refusal in the voting agreement demonstrated:

"[N]either [plaintiff] nor Utilities, Inc. intended to compromise, abrogate or limit any existing contractual right to acquire Utilities Inc. stock that [plaintiff] owned but only intended to preclude [plaintiff] in the future from entering into new contracts or agreements to acquire stock in which he had no then existing interest or rights."

We disagree and find that this is exactly what section 4 of this agreement sought to do. Specifically, section 4 states in pertinent part:

"[T]he Shareholder will not acquire, or agree, offer or seek or propose to acquire, directly or indirectly, alone or in concert with any other Person, by purchase or otherwise, or exercise any attribute of beneficial ownership *** with respect to, any securities of the Company, or direct or indirect rights or options to acquire *** any securities of the Company or any of the assets or businesses of the Company."

The language of this section is clear and unambiguous in stating that Owens is absolutely prohibited from acquiring *any* securities of any kind with respect to Utilities per his assent to this agreement. Despite the plain language of this agreement, Owens contends that the foregoing language does not prohibit the acquisition of his former wife's shares. This assertion is based, in part, upon certain correspondence between Owens and defendants. In one particular letter, defendant Jon Lind wrote to Owens and explained that, due to his entrance into the voting agreement, Utilities was no longer obligated to honor the restrictive stock legend placed on the shares of Owens' former wife after his divorce. Lind accompanied his letter with a predrafted waiver for Owens' signature. The waiver stated that Owens relinquished his right of first refusal to purchase his former wife's shares of Utilities originally granted to him by his divorce decree. Lind also explained that, although Utilities was removing the restrictive stock legends, such action did not necessarily vitiate his former wife's responsibility to offer Owens a right of first refusal to repurchase her shares. Lind followed this letter with another one approximately one week later, reaffirming that Utilities did not need to honor the restrictive stock legends placed on the shares of Owens' former wife. Once again, however, Lind wrote separately about the obligation of Owens' former wife to offer Owens a right of first refusal and about Utilities' removal of the restrictive stock legends from these shares. Additionally, Owens attempts to rely on a letter from Utilities president Lawrence Schumacher to Owens' former wife. In that letter Schumacher explains that, although the restrictive stock legends have been removed from

her shares of Utilities, such action does not necessarily free her from the obligation to offer Owens a right of first refusal to repurchase her shares, per her previous divorce decree.

According to Owens, defendants' correspondence supports his argument that the exercise of his right of first refusal was not barred by his execution of the voting agreement. Instead, Owens argues the foregoing correspondence is evidence that the intent behind the voting agreement was to limit his future acquisition of securities in Utilities. This line of argument is misplaced, however, because evidence outside the four corners of a contract will not be considered in construing an unambiguous contract. In order for this court to go beyond the four corners of a contract, we must first find that an ambiguity exists with respect to its construction. *Hillenbrand v. Meyer Medical Group, S.C.*, 288 Ill. App. 3d 871, 876, 682 N.E.2d 101 (1997) (the issue of contract interpretation to be decided initially by the trial court from an examination of the instrument as a whole before any extrinsic evidence is considered is whether the contract is ambiguous). After a review of section 4 of the voting agreement, we do not find that the voting agreement is ambiguous. Furthermore, we note that the instant agreement contains an integration clause which states:

> "This agreement (including the proxy and together with the Separation Agreement and the Supplemental Share Agreement) contains the entire understanding of the parties hereto with respect to the matters covered hereby and may be amended only by an agreement in writing executed by the Company and the Shareholder."

The presence of this clause is significant because it clearly indicates the parties' desire that the agreement be interpreted solely according to its own language. "Moreover, where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464, 706 N.E.2d 882 (1999). Thus, it would seem that this clause was included to prevent the very situation that has now arisen, which is the attempt by Owens to acquire further securities of Utilities after his official departure.

As a chief executive officer, Owens was hardly an unsophisticated party in entering the three agreements dictating his departure. Before entering into the voting agreement, Owens was free to negotiate the preservation of his right of first refusal in acquiring the 32,000 shares of stock previously distributed to his wife during his divorce. He did not. Accordingly, we will not consider extrinsic evidence of Owens' previously granted right of first refusal, his correspondence with Jon

Lind or the fact that the right of first refusal did not appear in the voting agreement to determine the intent behind this agreement. Such a determination would be clearly contrary to the plain language of the agreement itself. Thus, we look only to the four corners of the agreement itself and find that when Owens entered into this agreement he contracted away the right to purchase his former wife's stock during the proscribed limitation period. See *Omnitrus*, 256 Ill. App. 3d at 34.

In his reply brief, Owens argues that, when the separation and consulting agreement are read in conjunction with the voting agreement, it is clear that section 4 of the voting agreement was never intended to prohibit Owens' acquisition of Utilities stock through his right to purchase as articulated in his divorce decree. In support of this argument Owens refers this court to sections 4(e) and (g), which each provide Owens with 10,000 and 6,071 shares of Utilities stock, respectively. Based upon the issuance of this stock Owens further argues:

> "[T]he main purpose of the Voting Agreement was not, contrary to the McDermott Defendant's assertion, to restrict Perry's acquisition of shares of stock; it was to control (through a broadly worded proxy) how he voted all of his shares—hence, the name 'Voting Agreement' and not 'No Acquisition Agreement.' "

Once again, we disagree. Both clauses (e) and (g) condition the acquisition of these shares upon the restrictions outlined in the voting agreement. As Owens correctly notes, the voting agreement in part seeks to control how Owens will vote his shares of Utilities as part of his settlement for departing Utilities. Based upon the language of section 4, however, we also find that the voting agreement also seeks to control Owens' acquisition of securities in Utilities as well. As we have already discussed, section 4 specifically states that Owens shall not acquire any securities except as permitted by the terms of the voting agreement, separation agreement or the supplemental share agreement. Although Utilities did in fact allow Owens to acquire stock in its company, it did so under circumstances it controlled. We reiterate that section 4 unequivocally states that Owens:

> "will not acquire or agree, offer or seek or propose to acquire, directly or indirectly, alone or in concert with any other Person, by purchase or otherwise, or exercise any attribute of beneficial ownership with respect to, any securities of the Company, or direct or indirect rights or options to acquire any securities of the Company or any of the assets or businesses of the Company."

Therefore, contrary to Owens' assertion, we find that the instant agreement controls not only the manner in which Owens votes his

shares of Utilities, but also prohibits the acquisition of any securities of Utilities for the 10-year limitation period set out in the agreement.

■ Alternatively, Owens argues that the voting agreement is ambiguous and gives rise to genuine issues of material fact. Generally, a contract is deemed to be ambiguous if it is susceptible to more than one reasonable construction. *American States Insurance Co. v. A.J. Maggio Co.*, 229 Ill. App. 3d 422, 426-27, 593 N.E.2d 1083 (1992). If, after considering the language of an agreement, a court determines that the document is ambiguous, the court may then look beyond the agreement to ascertain the intent of the parties. *Hillenbrand*, 288 Ill. App. 3d at 876. It is not ambiguous however, if the court can determine its meaning without any guide other than a knowledge of the simple facts on which the meaning of the language depends. *American States*, 229 Ill. App. 3d at 426. The determination of whether a contract is ambiguous is an issue of law for the court. *Meyer*, 273 Ill. App. 3d at 888. Owens maintains that the voting agreement is susceptible to more than one meaning by virtue of the above letters subsequent to entering into this agreement. According to Owens, these letters demonstrate that the intent in drafting the voting agreement did not contemplate a prohibition against Owens from exercising his right of first refusal, since the correspondence from Lind requested a waiver from Owens with respect to this matter.

Given the import of the letters from both Lind and Schumacher, Owens' interpretation of what Utilities believed it could do and what effect its own actions had on Owens' right of first refusal is not unreasonable. Owens, however, has not established the first prong required that would allow such extrinsic correspondence to be admitted, that is, establishing that the contract, or in this case the voting agreement, is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression. *Meyer*, 273 Ill. App. 3d at 888, quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617, 529 N.E.2d 1138 (1988). Instead, Owens skips this step and simply moves to the next prong of the analysis by arguing that, once this court looks beyond the voting agreement's four corners, the extrinsic evidence of defendants' correspondence demonstrates an intent contrary to the language in the voting agreement. As we have previously pointed out, we will not consider extrinsic evidence outside the four corners of a contract if the terms of that contract are clear and unambiguous. *Omnitrus*, 256 Ill. App. 3d at 34. Rather, we determine the intent of the parties from the language of their agreement alone. *American States*, 229 Ill. App. 3d at 427; see *Meyer*, 273 Ill. App. 3d at 888 (holding that "[i]f the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language

of the contract, as a matter of law"). We note that whatever intent Owens may have envisioned at the time the contract was executed is immaterial, provided the terms contained therein are unambiguous. *American States*, 229 Ill. App. 3d at 427. Moreover, a contract is not rendered ambiguous simply because one party does not agree to its current construction. *American States*, 229 Ill. App. 3d at 426; *Meyer*, 273 Ill. App. 3d at 888 (disagreement between parties regarding how to interpret the terms of a contract does not in itself render the contract ambiguous).

Contrary to the four corners rule, Owens argues this court should provisionally consider the parol evidence of the letters to determine if the voting agreement is in fact ambiguous. The rationale behind the provisional admission of parol evidence is that in some cases it may be necessary to admit such evidence to show that an agreement, although clear on its face, is actually ambiguous. See *Bank of America National Trust & Savings Ass'n v. Schulson*, 305 Ill. App. 3d 941, 950-51, 714 N.E.2d 20 (1999). The provisional admission of parol evidence, however, may only be used to clarify the definition of terms in determining whether a contract is ambiguous; and where the terms are clear and unambiguous, parol evidence may not be considered to vary the meaning of those terms. *Schulson*, 305 Ill. App. 3d at 951-52. Moreover, as defendants correctly note, our supreme court in *Air Safety* expressly rejected the provisional admission approach where an agreement contains an explicit integration clause. *Air Safety*, 185 Ill. 2d at 464.

■ We find that the meaning of the voting agreement can be gleaned from a simple knowledge of the facts on which the meaning of the contract language depends. See *Forest Preserve District v. Brookwood Land Venture*, 229 Ill. App. 3d 978, 982, 595 N.E.2d 136 (1992). For example, section 4 of Utilities' voting agreement clearly states that per Owens' settlement agreement he agrees not to acquire "any securities of the Company." As defendants note in their brief, "[t]he word 'any' has broad and inclusive connotations." *People ex rel. Scott v. Silverstein*, 94 Ill. App. 3d 431, 434, 418 N.E.2d 1087 (1981). Although we acknowledge that in *Scott* the interpretation of the word "any" took place in the context of a preliminary injunction, we nonetheless find its interpretation relevant to the instant case. We also note that at least one definition found in Black's Law Dictionary states that the term "any" is synonymous with " 'either', 'every', or 'all.' " Black's Law Dictionary 94 (6th ed. 1990). In instances where the terms of a contract are clear and unambiguous, they must be enforced as written, and no court can rewrite a contract to provide a better bargain to suit one of the parties. *Barille v. Sears Roebuck &*

*Co.*, 289 Ill. App. 3d 171, 175, 682 N.E.2d 118 (1997). Such is this case here. Therefore, we do not find the term "any" to require any clarification. As a result, we decline Owens' invitation to alter the meaning of this voting agreement by construing this term in a fashion that would clearly be contrary to its intent, in addition to its plain and obvious meaning. *Forest Preserve*, 229 Ill. App. 3d at 982. Thus, we reject Owens' request to provisionally admit the extrinsic evidence of these letters.

■ We next turn to the question of whether section 4 of the voting agreement precluded Owens from assigning his right of first refusal to purchase the 32,000 shares of Utilities stock. In his brief, Owens argues that, at most, the voting agreement prevents him from acquiring stock in Utilities but does not prohibit another from acquiring the same stock if the right to acquire it was assigned prior to its sale. Additionally, Owens argues that "if Jon Lind had not breached his fiduciary duties, and if [plaintiff's former wife] had complied with her obligations and offered her stock to [plaintiff], then [plaintiff's] assignee Steve Keefer could have purchased [plaintiff's former wife's] stock." We fail to follow this line of reasoning.

"As a general rule, an assignment is a transfer of some identifiable property, claim or right from the assignor to the assignee. [Citation.] The assignment operates to transfer to the assignee all the right, title or interest of the assignor in the thing assigned. [Citation.]" *Litwin v. Timbercrest Estates, Inc.*, 37 Ill. App. 3d 956, 958, 347 N.E.2d 378 (1976). A basic principal of law applicable to all assignments is that they are void unless the assignor has either actually or potentially the thing which he attempts to assign. *Litwin*, 37 Ill. App. 3d at 958. Moreover, the assignee can obtain no greater right or interest than that possessed by the assignor. *Litwin*, 37 Ill. App. 3d at 958. The question then becomes what did Owens assign to his nephew. Defendants maintain that after Owens entered into the voting agreement he was precluded from assigning his right of first refusal since the voting agreement, a valid contract, specifically prohibited Owens' acquisition of any securities in Utilities. We agree.

Owens entered the voting agreement in December 1996. In April 1997, Owens attempted to assign his right of first refusal to his nephew. It is unclear from the facts whether Owens actually intended to assign this right or intended to assign it and then rescind it in an attempt to circumvent the restrictions outlined in the voting agreement. In either event, we find that the assignment was void since Owens attempted to assign his right of first refusal after entering into the voting agreement. We have already noted that the voting agreement contractually prohibited Owens from acquiring any stock of

Utilities. Thus, after the voting agreement was executed and for the limitation period, Owens could not exercise his right of first refusal to purchase his former wife's stock. As we have just indicated, in order for a valid assignment of right to occur the assignor must either actually or potentially have the thing which he attempts to assign. In this case Owens had neither. Moreover, an assignee cannot acquire a greater right or interest than the assignor possessed. *Reimers v. Honda Motor Co.*, 150 Ill. App. 3d 840, 843, 502 N.E.2d 428 (1986). In light of the foregoing, we reject Owens' contention that defendants tortiously interfered with the assignment of his right of first refusal to his nephew, since Owens failed to possess the right he wished to assign.

■ Although not articulated clearly, it appears that Owens' next claim asserts both a claim of legal malpractice as well as a breach of fiduciary duty. Generally, a claim against an attorney for breach of fiduciary duty falls under the rubric of professional malpractice. *Hanumadass v. Coffield, Ungarretti & Harris*, 311 Ill. App. 3d 94, 99-100, 724 N.E.2d 14 (1999). To properly state a cause of action for legal malpractice a plaintiff must allege in his complaint:

"(1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that 'but for' the attorney's negligence, the plaintiff would have prevailed in the underlying action; and (4) damages." *Serafin v. Seith*, 284 Ill. App. 3d 577, 586-87, 672 N.E.2d 302 (1996).

■ The proximate cause element of this claim requires that the plaintiff must plead facts sufficient to show that, but for the attorney's malpractice, the client would have been successful in the undertaking the attorney was retained to perform. *Serafin*, 284 Ill. App. 3d at 587. Thus, "[d]amages will not be presumed, and the client bears the burden of proving he suffered a loss as a result of the attorney's alleged negligence." *Serafin*, 284 Ill. App. 3d at 587.

■ A fiduciary relationship exists between an attorney and his client as a matter of law. *Doe v. Roe*, 289 Ill. App. 3d 116, 122, 681 N.E.2d 640 (1997). Once such a relationship is established:

"[T]he attorney-client relationship gives rise to certain duties owed by the attorney to the client without regard to the specific terms of any contract of engagement. Among the fiduciary duties imposed upon an attorney are those of fidelity, honesty, and good faith in both the discharge of contractual obligations to, and professional dealings with, a client. [Citation.] When, in the course of his professional dealings with a client, an attorney places personal interests above the interests of the client, the attorney is in breach of his fiduciary duty by reason of the conflict. [Citation.] Breach of fiduciary duty by an attorney gives rise to an action on behalf of the

client for proximately resulting damages. [Citation.]" *Doe*, 289 Ill. App. 3d at 122-23.

See also *Morris v. Margulis*, 307 Ill. App. 3d 1024, 1033, 718 N.E.2d 709 (1999).

■ Owens premises his breach of fiduciary duty count on defendants' alleged violation of Rule 1.9 of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.9). Based upon this claim, Owens believes he is entitled to disgorgement of defendants' fees with respect to the services rendered in removing the restrictive stock legend, as well as the attorney fees collected regarding defendants' prior representation of Owens in the divorce proceedings. Rule 1.9 states:

"(a) A lawyer who has formerly represented a client in a matter shall not thereafter:

(1) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after disclosure; or

(2) use information relating to the representation to the disadvantage of the former client, unless:

(A) such use is permitted by Rule 1.6; or (B) the information has become generally known." 134 Ill. 2d R. 1.9.

There is no question that defendants previously represented Owens during his divorce. During the divorce proceedings, while represented by defendants, Owens relinquished 32,000 shares of Utilities' stock to his wife. Owens was also advised by defendants to include a stock restriction that provided for Owens to have the right of first refusal in purchasing this stock should his wife choose to sell it.

■ Based upon the facts before us, it seems clear that when Owens left Utilities in 1996 it was under less than amicable circumstances. At that time, defendants represented Utilities, which made it clear through the settlement package and in particular by the terms of the voting agreement that it wanted Owens to be able to exert little or no control over its operations. From the defendants' allegations it can certainly be argued that the defendants' previous representation of Owens in the divorce proceedings, the creation of the right of first refusal and the placement of a restrictive stock legend were substantially related to defendants' later representation of Utilities in the ouster of Owens and particularly in counseling Utilities to remove the very same restrictive stock legend. Given the foregoing, it can also be argued that Owens' interests were materially adverse to Utilities' at the time of the removal of the restrictive stock legend. As a result, at least according to the allegations, defendants may have breached Rule 1.9.

The question then becomes whether Owens would be entitled to damages if he established that defendants breached Rule 1.9. Without more, we conclude that he is not. See *Doe*, 289 Ill. App. 3d at 129 (discussing that, even if an attorney breached his fiduciary duty to his plaintiff by engaging in a sexual relationship, the plaintiff would still be required to show some compensable damage). The mere fact that an attorney may have violated professional ethics does not, in and of itself, give rise to a cause of action for damages. *Doe*, 289 Ill. App. 3d at 128. Although the rules of professional conduct do not establish a separate duty or cause of action, they certainly would be relevant in a legal malpractice claim. See *Nagy v. Beckley*, 218 Ill. App. 3d 875, 881, 578 N.E.2d 1134 (1991) (holding "while the rules of legal ethics may be relevant to the standard of care in a legal malpractice suit [citations], they are not an independent font of tort liability").

Owens' claim for damages alleges that he was denied the opportunity to exercise his right of first refusal when defendants assisted Utilities in removing the stock restriction from his former wife's stock certificates. As a result, Owens alleges that under a theory of disgorgement he is entitled to the fees defendants collected because of their representation of Utilities as well as the fees collected from Owens during his previous representation. As we have already discussed in detail, Owens' ability to exercise his right of first refusal was a right that he contracted away by the terms and conditions of the voting agreement. Significantly, Owens' entrance into this agreement occurred well before defendants took any action to remove the restrictive legend from the stock of Owens' ex-wife. Thus, although we do not expressly reject Owens' claim that defendants may have violated Rule 1.9, we do not find that these allegations proximately caused Owens' inability to exercise his right of first refusal to purchase his former wife's shares of Utilities' stock. It was Owens' entry into the voting agreement that prohibited him from exercising the right of first refusal. Therefore, we reject Owens' claim that the breach of fiduciary duty count could survive under these facts. Accordingly, the decision of the trial court to dismiss the amended complaint against defendants is affirmed.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.