# Illinois Official Reports

## Appellate Court

---

## *In re Estate of Kelso*, 2018 IL App (3d) 170161

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF WILLIAM K. KELSO, Deceased (Sharon L. Kelso, Individually and as Executor of the Estate of William K. Kelso, Deceased, Plaintiff-Appellee and Cross-Appellant, v. Richard M. Beuke, Defendant-Appellant and Cross-Appellee). |
| District & No. | Third District<br>Docket No. 3-17-0161 |
| Filed | October 25, 2018 |
| Decision Under Review | Appeal from the Circuit Court of McDonough County, Nos. 11-P-25, 12-CH-52; the Hon. Rodney G. Clark, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Gino P. Naughton, of Tinley Park, for appellant.<br><br>Jeff W. DeJoode, of March, McMillan, Hennenfent, DeJoode, Duvall, James & Humbert, P.C., of Macomb, for appellee. |
| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justice Lytton concurred in the judgment and opinion.<br>Justice Schmidt dissented, with opinion. |

**OPINION**

¶ 1    Defendant attorney appealed from a McDonough County circuit court order reducing his contingent fee for legal representation in a motor vehicle settlement. Plaintiff, the injured party, cross-appealed, arguing that the attorney was, at most, entitled to *quantum meruit* recovery of his fees.

¶ 2    FACTS

¶ 3    The plaintiff, Sharon Kelso, and her late husband, William Kelso, were involved in a motor vehicle crash in Arizona in February 2011. William died as a result of the accident, and Sharon was seriously injured. The accident was the fault of the other driver, Shauna Nowicki. Nowicki was underinsured, with limits of $15,000 per person and $30,000 per accident. The Kelsos had their own insurance policy with $1 million underinsured coverage, through Auto Owners Insurance (Auto Owners).

¶ 4    On March 21, 2011, Sharon signed a contingency contract retaining the services of the defendant, Richard Beuke, for her claim. She signed a second, virtually identical, contract on April 13, 2011, as William's wife, to recover for William's injuries. Beuke was a friend of the Kelsos' son. Both contracts stated that Sharon was retaining Beuke to prosecute a claim or cause of action against Nowicki and/or others responsible for the Kelsos' injuries in the accident. The contracts state that Beuke and his firm were being retained "to prosecute a claim or cause of action against Shauna L. Nowicki and Daniel Raymond Porth, and/or other persons or entities responsible for the injuries sustained by" Sharon Kelso (in the first contract) and William Kelso (the second contract). The contracts provided that Beuke would be reimbursed for costs and expenses and attorney fees in the amount of one-third of any gross amount received by trial, settlement, or otherwise.

¶ 5    At some point, Nowicki's insurance carrier agreed to pay the $30,000 policy to Sharon. However, the company went into receivership soon after that agreement, and Sharon never received that money. Beuke considered some other avenues of recovery, including a medical malpractice action and an action against a third driver but determined them to be dead ends. Whether that was explained to Sharon is unclear. Thereafter, Beuke negotiated a settlement of the underinsured motorist claim with Auto Owners for the policy limit of $970,000 ($1 million less Nowicki's $30,000 policy).

¶ 6    Sharon testified that, after the settlement was reached with Auto Owners but before the check was received, she fired Beuke. Sharon filed a three-count complaint against Beuke. Count I sought construction of the contingent fee agreement. Count II was pled in the alternative for rescission of contract, and count III was pled in the alternative for breach of contract. Beuke filed a counterclaim, claiming entitlement to one-third of the recovery.

¶ 7    The matter proceeded to a hearing, and the trial court issued an opinion. The trial court concluded that the contingency fee agreement was not ambiguous: Sharon agreed to pay Beuke if he recovered for the negligence of Nowicki, and the source of the funding for that recovery did not change the intent of the parties, although it may impact the reasonableness of the fee. The trial court found that Sharon did fire Beuke, but not until after the settlement was reached, when the case was all but completed. The trial court went on to evaluate whether the full contingency fee was reasonable and concluded that it was not. The court reduced the fee to

25% of the $970,000 recovery.

¶ 8                                    ANALYSIS

¶ 9        Sharon agrees that the contracts were valid but argues that they were not applicable to the underinsured and uninsured motorists provisions of her own insurance policy. Alternatively, she argues that the contracts were ambiguous and that parol evidence should be considered to determine if the Kelsos' insurance policy was outside the scope of the contracts. Beuke contends that the trial court correctly determined that both representation contracts were unambiguous and enforceable but argues that the trial court erred in reducing the agreed-upon one-third contingency fee to one-fourth of the settlement amount.

¶ 10       In terms of contract interpretation, the court's primary objection is to give effect to the intent of the parties. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000). When the terms of contract are clear and unambiguous, the parties' intent must be ascertained from the language of the contract itself. *Id.* Matters of contract interpretation are subject to a *de novo* standard of review. *Sandlin v. Harrah's Illinois Corp.*, 2016 IL App (3d) 150018, ¶ 10.

¶ 11       The contracts state that Beuke and his firm were being retained "to prosecute a claim or cause of action against Shauna L. Nowicki and Daniel Raymond Porth, and/or other persons or entities responsible for the injuries sustained by" Sharon Kelso (in the first contract) and William Kelso (the second contract). To determine whether the contracts are clear and unambiguous, we must look to the language of the contracts. Black's Law Dictionary defines "claim," *inter alia*, as "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing." Black's Law Dictionary (10th ed. 2014). "[C]ause of action," is defined as "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *Id.* Thus, Sharon Kelso hired Beuke and his firm to prosecute a claim (an interest or remedy) or a cause of action (a factual situation that entitles one person to obtain a remedy in court from another person) against the persons responsible for the injuries sustained by the Kelsos. Beuke was to be reimbursed for costs and expenses and attorney fees in the amount of one-third of any gross amount by trial, settlement, or otherwise.

¶ 12       Under the terms of the contracts, Beuke pursued different avenues of recovery. He investigated the possibility for a medical malpractice suit but determined that to not be a valid claim. He considered whether Porth and his employer could be liable, but that was determined not to be the case. He negotiated medical liens. And he negotiated with, and ultimately reached a settlement agreement with, Auto Owners, based upon Nowicki's negligence.

¶ 13       Sharon does not dispute that Beuke reached the settlement with Auto Owners on her behalf but contends that, since it was paid by her own insurance policy, it was not within the ambit of the contracts. The trial court found, however, that the contracts were clear and unambiguous and that Beuke obtained a settlement based upon Nowicki's negligence and that the source of the payment for Nowicki's negligence was not relevant. The dissent contends that Auto Owners was contractually obligated to pay the Kelsos pursuant to their underinsured motorist policy. But, as the trial court found, payment pursuant to underinsured coverage was not automatic; rather, it was based upon both the tortfeasor's liability and the fact that the tortfeasor's policy limits were lower than the injured person's policy limits.

¶ 14    We agree that the terms of the contracts were clear and unambiguous. Beuke commenced proceedings to recover on the claim that the Kelsos had under the law for Nowicki's negligence. Beuke obtained the remedy that the Kelsos were entitled to, based upon Nowicki's negligence. The proceedings ended in a settlement, which is "[a]n agreement ending a dispute." Black's Law Dictionary (10th ed. 2014). Since the contracts were clear and unambiguous, we do not consider parol evidence. Sharon retained Beuke to recover for the negligence of the people that caused the accident, which is what Beuke ultimately did.

¶ 15    Next, Sharon argues that if the contracts were enforceable, a one-third fee was unreasonable under the circumstances. Beuke argues that the representation contracts were entered into by competent adults and the one-third contingency fee was reasonable. He contends that he obtained the full settlement from Auto Owners, eliminated the Medicare lien, and avoided protracted litigation or the need for arbitration.

¶ 16    Contingency fee agreements are generally enforced unless they are unreasonable. *In re Estate of Sass*, 246 Ill. App. 3d 610, 614 (1993). Courts have the authority to scrutinize contingency fee agreements to ensure that they are reasonable and do not result in the collection of an excessive fee. *Id.* However, under Illinois law, a client has the right to terminate her attorney at any time. *Will v. Northwestern University*, 378 Ill. App. 3d 280, 303 (2007). When this occurs in a contingent fee agreement setting, the agreement becomes void, and the contingency term is no longer enforceable. *Id.* This does not mean that a discharged attorney is not entitled to be paid; rather, he is entitled to be paid a reasonable fee based on a *quantum meruit* basis for services rendered prior to termination. *Id.* at 304. When determining a reasonable fee for services rendered, courts consider the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the client. *Id.* When the attorney is fired right before settlement or, in this case, after the settlement was reached, consideration of the factors relevant to a reasonable fee often results in the entire contract fee. *Id.*; see *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 228-29 (1979). The burden of proof is on the attorney to establish the value of his services. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991). A trial court has broad discretionary powers in awarding attorney fees, and its decision will not be reversed on appeal unless the court abused its discretion. *Id.*

¶ 17    In *Wegner v. Arnold*, 305 Ill. App. 3d 689, 693, 695 (1999), the Second District concluded that the contract fee of one-third was the reasonable value of the attorney's services when the attorney was fired just before settlement. The attorney had expended at least 53 hours of legal work over 18 months, and his legal work resulted in a recommendation that the insurance company pay the policy limit to settle the plaintiff's claim. *Id.* at 695. The First District reached the same conclusion in *Will v. Northwestern University*, 378 Ill. App. 3d 280 (2007). In *Will*, some of the factors that the court considered in affirming the one-third fee award were that the plaintiff's attorney worked on the complex wrongful death case for four years, took 24 depositions, participated in extensive mediation proceedings, and reviewed the settlement demand prior to being terminated as counsel. *Id.* at 306.

¶ 18    In this case, the trial court found that Beuke worked on the case for about 18 months and obtained the maximum recovery available. Beuke did all of the work from the confines of his office, and he did not have to file suit, initiate arbitration, or participate in discovery. He did explore other recovery options and successfully negotiated the Medicare lien. Also, he was

discharged after the settlement had been reached. Thus, the trial court determined that a one-third recovery was not reasonable under the circumstances. Rather, the trial court determined that a one-fourth recovery of the settlement amount of $970,000 was a reasonable fee. We find no abuse of discretion in that decision.

¶ 19 Sharon also argues that Beuke was not entitled to anything more than nominal fees because he did not maintain time records. However, Beuke had a contingency fee agreement; he was not required to do so to recover on the contingent fee agreement or a claim of *quantum meruit*. *Id.*

¶ 20                                  CONCLUSION

¶ 21 The judgment of the circuit court of McDonough County is affirmed.

¶ 22 Affirmed.

¶ 23 JUSTICE SCHMIDT, dissenting:

¶ 24 I disagree with the majority and the trial court's conclusion that the contingency fee agreements at issue unambiguously entitled Beuke to a portion of Auto Owners' payment. Both agreements state that Sharon retained Beuke "to prosecute a claim or cause of action against Shauna L. Nowicki and Daniel Raymond Porth, and/or other entities *responsible for the injuries sustained by* [Sharon and William Kelso]." (Emphasis added.) Nowicki and Porth were both potential tortfeasors. A reasonable interpretation of the catchall clause, "and/or other entities responsible for [the Kelsos' injuries]," is that it refers to other potential tortfeasors. Although I believe that this language unambiguously refers to tort claims, not contract claims, it is at least ambiguous as to whether Beuke is entitled to a contingency fee for Auto Owners' payment.

¶ 25 The majority characterizes Auto Owners' contractual obligation as a tort recovery for negligence. The majority rests its holding solely on the premise that Beuke's "recovery" from Auto Owners compensated Sharon "for the negligence of the people that caused the accident" (*supra* ¶ 14). That premise is both incorrect and irrelevant to this case.

¶ 26 The majority's premise is incorrect because it equates the Kelsos' insurance to tortfeasors' damages. Auto Owners was not a tortfeasor in this case; it was contractually obligated to pay the Kelsos pursuant to their underinsured motorist (UIM) policy, for which they paid premiums. Regardless of the contractual conditions for payment, Auto Owners was not "responsible for" the injuries. Auto Owners had a contractual obligation to the Kelsos; it had no obligation to any potential tortfeasor in this case. Not even a sophisticated layperson would construe the language "entities responsible for the injuries sustained" to include his/her own insurance carrier.

¶ 27 The majority's premise is irrelevant because the agreements' plain language requires Beuke to recover damages *from* negligent parties. In the agreements, Beuke agreed "to *prosecute* a claim or cause of action" (emphasis added) against Nowicki, Porth, "and/or other entities responsible for" the Kelsos' injuries. This language plainly clarifies the scope of Beuke's services as "prosecut[ing] a claim or cause of action" against tortfeasors. Beuke never prosecuted a claim or cause of action against any of the entities referenced in the agreements or any other tortfeasor. Nor did he recover a nickel from any negligent party.

¶ 28 Although I believe that the fee agreements unambiguously refute Beuke's entitlement to a contingency fee for Auto Owners' payment, the majority's opposite conclusion is objectively unreasonable. Beuke's entitlement to a contingency fee in this case is, at best, ambiguous. Contract language is ambiguous if it is susceptible to more than one meaning. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991). The language at issue explicitly refers to potential tortfeasors (Nowicki and Porth) but fails to mention contract claims or the Kelsos' insurance. No language in these agreements explicitly entitles Beuke to any percentage of Auto Owners' payment. One could reasonably interpret the agreements' language, as I do and as Sharon Kelso did, to entitle Beuke to a portion of any recovery from a tortfeasor. Clearly, the language is susceptible to a meaning other than the one the majority adopts.

¶ 29 If contract language is ambiguous, courts may consider extrinsic language to ascertain the parties' intent. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288 (1990). Ambiguous fee agreements are construed strictly in favor of clients and against the lawyers who draft them. *In re Solis*, 610 F.3d 969, 972 (7th Cir. 2010) (citing *Guerrant v. Roth*, 334 Ill. App. 3d 259 (2002)). Beuke provided no evidence, at trial or on appeal, to demonstrate that Sharon hired him to pursue the UIM claim from Auto Owners or knowingly agreed to pay him a portion of the settlement; he relies solely on the agreements' plain language.

¶ 30 On the other hand, Sharon testified that she hired Beuke to hold the negligent parties civilly or criminally responsible for her injuries and her husband's death. She believed that Beuke assisted her with the Auto Owners settlement because he knew her son and because Auto Owners requested the same documents that Beuke needed to prosecute a tort claim anyway—obtaining Auto Owners' payment required very little additional work or documentation. The record overwhelmingly supports Sharon's testimony.

¶ 31 In March 2011, *before* Sharon signed either of the fee agreements at issue, Sharon's daughter informed Beuke that the Kelsos purchased $1 million in UIM coverage from Auto Owners. He promptly sent Sharon the agreements without explaining them and without ever discussing her case. The agreements do not reflect Beuke's intention to enforce the Kelsos' UIM policy, which he knew about prior to sending Sharon the agreements, or to take one-third of Auto Owners' payment. We must construe these ambiguities strictly in Sharon's favor. See *Solis*, 610 F.3d at 972. At minimum, Beuke had a duty to ensure that Sharon, as his client, understood what services he intended to provide and what fees he would charge for them before she signed the agreements.

¶ 32 The record also indicates that Beuke never seriously pursued or prosecuted any claim against Nowicki, Porth, or others "responsible for" the Kelsos' injuries, which was precisely why Sharon hired him. In October 2011, Beuke sent Sharon a letter that discussed Nowicki's liability insurance. However, he never filed an action or obtained any portion of Nowicki's $30,000 policy limits. Instead, he abandoned the claim after a few communications with Nowicki's insurer.

¶ 33 Beuke's October 2011 letter also stated that he spoke with the emergency department manager at Northwestern Memorial Hospital in Chicago about Sharon's case. The manager opined that William Kelso's medical treatment providers negligently failed to prevent or treat the blood clot that caused his death. However, Beuke never pursued a medical negligence claim. At trial, Beuke testified that he subsequently met with a group of colleagues who

decided that Sharon had no viable cause of action. He never disclosed this subsequent meeting to Sharon. Nor did he inform her that he abandoned the claim.

¶ 34 Beuke's letters either prematurely or falsely assured Sharon that he intended to pursue the tortfeasors that she hired him to sue. Then, Beuke abandoned the tort claims without notifying Sharon. He failed to recover any damages from any party "responsible for" the Kelsos' injuries. He focused nearly all of his efforts toward recovering the Kelsos' UIM policy limits from Auto Owners, yet the fee agreements never mention Auto Owners or the Kelsos' policy. After Auto Owners agreed to pay Sharon $970,000 (the $1 million limit minus Nowicki's $30,000 limit that Beuke never obtained), Beuke told Sharon *for the first time* that he intended to take one-third of the payment ($323,393.33) as his fee; Sharon fired Beuke after learning that he intended to charge her over $300,000 for services she did not request, not because she wanted to avoid paying him a fair rate.

¶ 35 As the majority states, the primary objective of contract interpretation is to effectuate the parties' intent. *Supra* ¶ 10. The record unequivocally supports Sharon's testimony that she hired Beuke to hold the tortfeasors accountable for her injuries and her husband's death. She agreed to pay Beuke one-third of damages recovered from tortfeasors, not the Kelsos' insurer.

¶ 36 The majority's holding is neither legally nor factually supported by the record. It also condones poor communication and a lack of transparency that lawyers should zealously avoid. The trial court erred in finding that the agreements unambiguously contemplated the Auto Owners payment and in awarding Beuke one-fourth ($242,500) of Sharon's recovery. I would reverse the trial court's judgment and hold that Beuke is entitled only to *quantum meruit* fees for his services, which he failed to prove at trial. He kept no time logs or any other records that proved fair value for his services. Due to this lack of evidence, I would award Beuke no fees in this case.

¶ 37 It seems obvious that Beuke abandoned the negligence and medical malpractice claims in favor of grabbing the low-hanging fruit (the UIM policy) without first discussing this with his client. Lawyers are in a unique position with respect to their clients. How hard would it be to have the contingent fee contract expressly state that an attorney will seek recovery, not only from tortfeasors, but also from any insurance carried by the client? The fact that it is not commonly done is no excuse. "Physician [lawyer] heal thyself." Prepare contingent fee contracts that plainly set forth that the services to be performed under the agreement include any claims the client may have against its own insurer by virtue of insurance contracts. What is difficult about that?